IN RE APPLICATION OF CORRIGAN.

[Cite as In re Application of Corrigan (1989), 47 Ohio St. 3d 32.]

(No. 89-673—Submitted September 12, 1989—Decided November 29, 1989.)

*Charles W. Kettlewell* and *Robert E. Sweeney,* for applicant.

*Thompson, Hine & Flory* and *Gerald L. Draper,* for the Board of Bar Examiners.

*Per Curiam.* The panel and the board based their recommendations on the protracted nature of Corrigan's cheating, her lack of candor at the hearing before the panel, and her failure to fully inform her character references of the charges against her. Corrigan objected to the recommendation. Before this court she contended that (1) the hearing was unduly adversarial and focused on past misconduct instead of present character thereby "taint[ing]" the panel's recommendation, (2) her "trial" counsel was ineffective and should have advised her to withdraw her current application, among other things, so that she could later establish her rehabilitation, (3) she did not lack candor at the hearing — the panel was merely confused — and (4) the recommendation is too harsh because the sanction is permanent unlike the punishment of many attorneys who receive only indefinite suspension for equally grievous misconduct. We address these contentions serially.

First, we find that the hearing before the panel was somewhat adversial because, necessarily, it was primarily concerned with her recent, admitted misconduct at the bar examination rather than with any total conduct over a lengthy period. This is appropriate under the circumstances.

In *In re Application of Davis* (1974), 38 Ohio St. 2d 273, 67 O.O. 2d 344, 313 N.E. 2d 363, we stated:

"The paramount concern in proceedings before the Board of Commissioners on Character and Fitness is whether the Applicant possesses those moral traits of honesty and integrity which enable him to fully and faithfully discharge the duties of our demanding profession. We view such proceedings as being different from the adversary contest associated with, for example, disciplinary cases. A hearing to determine character .and fitness should be more of a mutual inquiry for the purpose of acquainting this court with the applicant's innermost feelings and personal views on those aspects of morality, attention to duty, forthrightness and self-restraint which are usually associated with the accepted definition of 'good moral character.' *Such a view commands the utmost in cooperation between the applicant and the board, and leaves little room for the employment of doctrines which work to keep relevant information from the board.* Although those devices are valid and proper in many instances, they should not be invoked before a body whose sole function is to fully determine all the facts which can logically reflect upon the wisdom of admitting an applicant with a questionable background to the practice of law." (Emphasis added.) *Id.* at 274-275, 67 O.O. 2d at 345, 313 N.E. 2d at 364.

In that case, a 1973 applicant for admission to the practice of law had been indicted for burglary and grand larceny in 1969, had pled guilty to grand larceny in 1970, and had been sentenced to five years' probation in 1971 on condition he drop out of law school. Attempting to focus on this criminal past, the board called as a witness the attorney who had represented Davis in the criminal proceedings. Davis invoked the attorney-client privilege, and the board respected it. *That* is the context in which we suggested, generally, that admissions cases should be nonadversarial. The case does *not* suggest that the board should refrain from asking penetrating questions about known past misconduct; in fact it suggests the opposite.

In this case, counsel for the Board

of Bar Examiners and members of the panel questioned Corrigan closely on the events of and her feelings during and about the cheating incident. They questioned her even more closely when her initial answers seemed equivocal or evasive. This was totally within the spirit of *Davis* and is therefore appropriate. Corrigan's first objection is meritless.

Second, it may have been wiser procedurally for Corrigan to withdraw her current application and apply herself to interim activities that would establish her rehabilitation. However, we do not define the decision not to do so as ineffective assistance of counsel. Moreover, there is no guarantee that the withdrawal of her current application would have been effective. Gov. Bar R. I does not give an applicant a specific right to avoid the results of an investigation by withdrawing his or her application. Section 9(B)(2)(e) of the rule permits the Board of Commissioners on Character and Fitness to "* * * at any time prior to an applicant's admission to the practice of law, investigate *sua sponte* the applicant's character, fitness, and moral qualifications." The rule does not require the board to let evidence of incidents such as this grow stale because an applicant withdraws and reapplies later. In any case, Corrigan did not withdraw her application, and the Board of Commissioners on Character and Fitness properly heard the matter on referral from the Board of Bar Examiners. Corrigan's second objection is meritless.

Third, Corrigan argues that the panel and board misunderstood part of what she was saying at the hearing and incorrectly took her answers for lack of candor. Specifically, she maintains that the answers shown on her answer sheet were the product of her own thought, despite the several hours she spent copying applicant 306's answers and attempting to and succeeding at correlating his questions with hers, because she could never ascertain for any question, even though correlated, whether 306's lettered answers, "(A)," "(B)," "(C)," etc., were in the same order as hers.

It is more likely that the panel disbelieved rather than misunderstood this claim. Against the claim was the evidence that Corrigan's and 306's answers to the first eighty-six questions were the same seventy-five times and that erased numbers in Corrigan's test booklet corresponded to 306's question numbers. Moreover, even if the claim were true, it would not diminish her culpability, which she ultimately admitted. Finally, there were other examples of her lack of candor. For example, when she was questioned by counsel for the Board of Bar Examiners about markings in her test booklet, she stated:

"Q. Now, looking at questions 101 and 102, there is a C and A written above these two questions. Did you write that there?

"A. Yes.

"Q. Do you remember why you wrote that there?

"A. No.

"Q. Looking at page 4 and 5, the letter D is above 103 and letter C above 104. Did you write that?

"A. Yes.

"Q. Above 105 and 106 there are lines, heavy lines, drawn. Did you make those?

"A. Yes.

"Q. Do you know why you did that?

"A. No. I assume that I made these marks because it's my book. I don't remember exactly making them or I don't remember exactly why.

"Q. Can you make out what has been erased above 114?

"A. It looks like an 11.

"Q. Could it be a 16?

"A. Yes.

"Q. Do you recall writing numbers and then erasing numbers on your booklet?

"A. I did obviously. I just don't recall it, no. I mean, I did it but —

"Q. Okay. The 7 in the number 97 here, corner of the page, what I will call European 7 with a line through it, is that how you make your 7s?

"A. Yes.

"Q. Pages 14 and 15 there are a lot of dark markings above the test numbers for the questions. Did you make those marks?

"A. Yes I did.

"Q. You are saying you don't remember why you made the mark?

"A. Different marks were different things. I wrote all over this book, it's obvious I wrote all over my morning book too. Some were checks, some were other markings."

When questioned by panel member Richards about correlating questions she stated:

"Q. I am not asking about his A, B, and C right now, I am asking you whether you looked at his question book and looked at it as you were looking at yours in an open fashion and then would see, for example, that his 112 looked the same as your 113. Isn't it correct that you did that, you saw the answer sheet, you correlated the questions and then in that respect you succeeded?

"A. I don't know. Yes, but I didn't do it all the way through the book. I mean [sic], seen the line, maybe that would be all, I didn't know if it was the same. I just didn't know. Yes, I would look at his thing, I did and tried to read it. I don't know. I don't remember exactly how I did it or —

"Q. Well, are you saying that as you sit here today you don't recall an instance where you were able to look at his question book and make a judgment that his, for example, 111 was your question 112?

"A. That is no. I am sorry.

"Q. You are saying that there were at least instances where you said his question was probably the same as my —

"A. Probably my 113.

"Q. 112 or 113, so you did make a correlation in that respect?

"A. Yes.

"Q. Okay.

"A. Sometime I am just confused by — I am sorry. Yes, I did make that.

"Q. I will tell you my point of confusion as you answer yes to that there was a correlation made and then you turn around and say I tried but I didn't succeed and you keep taking it back and I'm just trying to determine what it is that you are saying here today.

"A. Okay.

"Q. You are saying that there were times that you could make a correlation between his questions and your questions?

"A. Yes, there were, I am sorry, I was just confused by your questioning.

"Q. And despite conceding that you know there were instances where you made that correlation is it still your testimony that the handwritten penciled in numbers that appear to show that correlation, i.e., that your 112 is his 113, was not for that purpose?

"A. They could have been, could have been. I am telling you I do not remember much that afternoon.

"Q. Do you recall, when you made that correlation did you keep it in your head?

"A. It could be. I don't know. I don't remember. I was like — I remember very little of that whole Bar Exam time. I remember — I can't tell you the questions that were on it.

"Q. I am not asking you in terms of the substance of a particular question.

"A. I know that. It's really vague to me on what I did during the exam and I probably wrote checks, I had markings, I did marks on both days' books.

"Q. Let me ask you this: the markings that you did, some of them would have been, for example, as you are reading the question you want to stress a thought or a point that is in the question, I assume.

"A. Yes.

"Q. Would it also be correct that some mark is that as you were trying to do this and do this correlation that you did use markings in terms of that?

"A. Yes.

"Q. So some of the marks in the book do relate to your correlating questions?

"A. Yes."

From the foregoing, it is obvious that even at the hearing Corrigan was trying to minimize her culpability by improbable lapses of memory. Her third objection is meritless.

Fourth, she argues that the recommendation is too harsh because equally culpable attorneys are given only indefinite suspensions from the practice of law, whereas under the recommendation of the board, her punishment would be permanent and irrevocable.

Imposing sanctions for misconduct is not an exact science. However, in general, we impose indefinite suspension rather than permanent disbarment in cases where there is at least some evidence of the offender's redeeming qualities. Here, there is no such evidence.

Corrigan was discovered and observed to have engaged in a complex cheating scheme over a protracted period on the very examination that is supposed to demonstrate her basic competence to be an attorney. Thus, as her first act on the threshold of legal practice, she acted dishonestly in a way seriously indicative of bad character. When called to account for this conduct, she first lied and then only equivocally and defensively admitted to misconduct before those who observed it and before the panel of the Board of Commissioners on Character and Fitness. She introduced character witnesses, but upon investigation the witnesses were found to be ill-informed or uninformed about the charges against her. Thus, she has established a record replete with evidence of bad character and with no evidence of redeeming qualities.

Accordingly, we adopt the findings and recommendation of the Board of Commissioners on Character and Fitness. Colleen A. Corrigan's application for admission to the practice of law is hereby denied, and she is prohibited hereafter from reapplying to take the state bar examination and from reapplying for admission to the practice of law in this state. Costs taxed to applicant.

*Application denied.*

MOYER, C.J., HOLMES, DOUGLAS, WRIGHT, H. BROWN and RESNICK, JJ., concur.

SWEENEY, J., dissents.

SWEENEY, J., dissenting. The applicant's conduct during the "multistate" portion of the July 1988 bar exam is totally inexcusable as well as reprehensible. While the applicant's actions deserve harsh punishment, I cannot agree with the majority that they deserve what is essentially a death sentence to her legal career. Since the majority has precluded any possibility for applicant's rehabilita-

tion, I must respectfully dissent from its decision.

As the majority readily observes, imposing sanctions for misconduct is not an exact science. Nevertheless, I am unpersuaded that the conduct underlying the punishment meted out in the cause *sub judice* is any more egregious or deserving of the ultimate sanction than the conduct of attorneys in cases where an indefinite suspension was the penalty.

Upon a careful review of the record, I firmly believe that the applicant has indeed expressed sincere remorse over the extremely poor judgment she displayed on one particular afternoon in July 1988. The majority reproduces select passages from the testimony of the applicant before a panel of the Board of Commissioners on Character and Fitness and cynically concludes that "* * * it is obvious that even at the hearing Corrigan was trying to minimize her culpability by improbable lapses of memory." In addition, it appears that the majority is of the opinion that applicant's equivocations reveal that she was not only trying to minimize her guilt, but that she had no appreciation for the wrongfulness of her conduct during the second day of the bar exam. However, my reading of the *entire* transcript reveals a confused, frightened and beleaguered young woman who does in fact realize the wrongfulness of her conduct and who does in fact realize that she probably has irreparably damaged a promising legal career.

Applicant's remorse over her conduct is abundantly clear from the following passages of her testimony before the panel:

"Q. * * * You indicated that you understand now what you did was wrong. At the time you thought you were just comparing, or I think that was your word. Why did you deny ini-

tially — let me ask you, do you agree with the witnesses that previously testified to the effect that when the meeting started and you were discussing the matter with the Clerk of Courts and Mr. Byers and Mr. Shea that you initially denied looking at or doing anything of that?

"A. I did, I initially denied it. I was scared. I didn't know. I don't remember half the stuff I said or what I didn't say, I don't remember. I just remember being scared and thinking my whole life is gone.

"Q. You understood that what you had done was wrong and you were scared, is that correct?

"A. When I did it I didn't think it was, I thought it was wrong, I just was — like didn't think when I did it. When I was talking to them in the room I was thinking, yes, what I did was probably wrong and that I am in a lot of trouble, there goes my whole life basically. So I was scared, yes.

"Q. When you are looking at someone's answer sheet, whether you are checking or whatever the circumstances or for whatever reason in an examination, when you are looking at someone else's answer sheet you didn't think it was wrong?

"A. I did, I thought it was wrong. I didn't think it was right. I just didn't think — I mean it's — I didn't think that was the major thing — what I did was wrong, I do not think I just — I didn't think it was wrong. I didn't think it was right. I just didn't think that was wrong, that is wrong. I just didn't — I don't remember what I was thinking. I know now exactly what I did was wrong and if I hadn't gotten caught, if anything — what I did was wrong plane [*sic*] and simple and —

"Q. Did you understand it was wrong at the time you were doing it or did you not? That is what I am asking.

"A. I didn't think — yes, it was

wrong, yes, I guess I understood it wasn't right at the time.

"Q. I wonder if you would tell me in light of your recognition that you did something wrong, that you cheated on the Bar exam, would you tell the Panel why today you think you should be able to sit for another examination, why you believe today that your character and fitness do qualify you for that? I would like to give you the opportunity to tell me why you feel that way.

"A. I believe — well, I told you what I did was wrong. I am very — basically a very good person. Honestly — I could never — I have always been willing to help anyone that needed anything. I always wanted to be an attorney. I always wanted to do that. I made a mistake, a very big mistake, and I will be — whether you let me sit for the Bar or whether you don't, I will pay for that the rest of my life just with me because I know what I did, but I made a mistake and that is what it was, and very horrible, bad mistake, but I think that I know that I will never do it again and I think that I should be given that opportunity.

"I know that I would in fact — I would probably make a better — I know exactly what I did impropriety-wise and moral ethicwise, everything, and how I act and I think I would be more on my guard just to make sure I would never put anyone — put my family, put me through this again. And I think I would make a good attorney too. I think I do a good job, I care about people, I care, I am loyal to people. I think I would do a good job and I think it would be a shame that if you won't let me practice again because I think I would do a good job.

"I think I have done a good job in the firms I have worked for in the past and in the work I have done in the past. I worked for various other law firms. I always worked around the courts from when I was in high school on. It would basically — I don't know what else to say. Just I think I would — it would be a shame and — the general idea that I would make a good lawyer and this just puts me more on guard and everything to make sure I make a good lawyer because I — I owe a lot and just can't ever do anything wrong, mess up again, because it's just — the shame is just unbelievable. I don't know what else to say in that I am a good person. I messed up, I made a mistake, a big mistake."

The foregoing passages also reveal that applicant's hearing before the panel was a far cry from the nonadversarial proceeding that should have taken place according to our prior pronouncement in *In re Application of Davis* (1974), 38 Ohio St. 2d 273, 274, 67 O.O. 2d 344, 345, 313 N.E. 2d 363, 364. In my view, appellant's apparent equivocations were more a result of adversarial cross-examination, confusion and fright, than a result of an attempt to minimize her culpability.

The majority also seems to ascribe a lack of remorse to the applicant based on the fact that she was not totally candid to the people from whom she requested character references. However, I do not find that such behavior indicates a lack of remorse. Instead, I believe that the applicant was not only frightened over the consequences of her actions, but that she was also filled with great shame and embarrassment, as the following testimony indicates:

"Q. * * * [L]et's go to the letters. Did you feel that it was fair to those individuals to ask them to write a letter for this hearing and yet not inform them of the nature of the hearing?

"A. I didn't really know. I didn't think about it. I just asked them for a letter of reference on my character. I didn't — I just didn't think whether it

was fair for me to inform them or not.

"Q. Would it be fair to say that because of your shame over this incident you really tried to keep it quiet as opposed to telling anyone?

"A. Generally, yes, I have tried to keep it fairly down key. What I did was wrong and if — if it would do any good for me to tell everyone in the world I would, but I didn't feel that it would do a lot of good for me to [be] telling everyone in the world everything that I had done that is wrong."

Applicant's shame and remorse, as well as her conception that attorneys are held to a high level of ethical scrutiny, are evidenced by the following testimony she gave the panel:

"Q. Now, your father was an attorney and you have uncles or cousins who are attorneys?

"A. Yes, I have a cousin who is a County Prosecutor in Cuyahoga County and another cousin who is a judge. I have a couple other cousins who are attorneys.

"Q. Do you believe that an attorney should be held to any different standard than businessmen, corporate officers or —

"A. Yes.

"Q. Why?

"A. Because they have higher responsibility. Their standard should be so much higher, unbelievable. They have greater responsibility than the average person I think. I don't know if you are talking about the average person corporate, but what they represent is suppose[d] to be ideal and what they are doing is suppose[d] to be ideal and that is why they should be accountable and they should have higher standards, yes.

"Q. Do you believe that or do you think that is some kind of an old fashion[ed] carryover from prior generations?

"A. No. I believe it. Maybe I

believe it because it is something my father told me, maybe it's something that I grew up with with all my family and stuff like that, but it's basically you have something to live up to and you better do it and better not let anyone down. This is the thing I was instilled with my whole family, you have something to live up to, don't blow it and make sure you live up to it and try to go higher if you can because it's — that is my whole family and that is what they do. I think that is — well, I brought more shame, maybe more than the average person or, you know, but the shame I brought on my family hurts me unbelievably because that is what they do."

The majority justifies its capital-like sanction of permanently precluding applicant from becoming a lawyer by its conclusion that there was no "evidence of [her] redeeming qualities." However, my review of the *entire* record reveals a young woman who has quite a few redeeming qualities and who should at least be given the opportunity to prove rehabilitation. While, in light of her conduct, the applicant would have a tremendous burden in proving her rehabilitation by clear and convincing evidence, *Davis, supra,* at 275, 67 O.O. 2d at 345, 313 N.E. 2d at 364-365, I feel that she should not be denied that opportunity to prove rehabilitation at some point in the future.

Contrary to the majority's assertion, the record does in fact reveal the applicant's redeeming qualities in the testimony of her friends and acquaintances. Particularly illuminating is the testimony of one of the applicant's former law professors who testified before the board as follows:

"Q. All right. Would you tell the Panel what your observations were of Colleen Corrigan as a student?

"A. Colleen was a very good stu-

dent in my class. She was prepared, she was active, she attempted to indicate to me that she had a grasp of the material. She was a popular person among her classmates. All I can say is she was an excellent student.

"Q. Was there at any time any incident that might have occurred that indicated that Colleen Corrigan was not doing her own work?

"A. No, never.

"Q. You indicated that you have known her outside of the classroom.

"A. Yes.

"Q. Are you also acquainted with people outside of the classroom who knew Colleen Corrigan?

"A. Yes.

"Q. Are you acquainted with what their opinion was of her reputation and good character?

"A. Yes.

"Q. Would you tell the Panel?

"A. I think that Colleen is one of the most well liked, respected people in our class. I think her reputation was impeccable among her colleagues.

"Q. Do you feel that same way?

"A. I do, yes.

"* * *

"Q. Professor Marshall, you are admitted to practice in the State of Ohio?

"A. Yes, I am.

"Q. As a professor of law with the knowledge that you have of Colleen Corrigan as a law student and also various social gatherings, in your opinion does she possess the good moral character and fitness required of a person to practice law?

"A. Yes. If I could expand on that for a moment.

"Q. Yes.

"A. I know Colleen well enough to know that she made a mistake and she knows she made a mistake and obviously what she did was wrong, there is no defense for doing what she did, but it's more revealing of her character that she immediately admitted what she had done and probably over-characterized it as to her detriment as opposed to trying to make excuses and trying to in some way claim that it wasn't significant, what occurred or didn't occur. I think that is more of an indication of her character than her lapse in judgment or temporary lapse in judgment that took place at the Bar exam.

"Q. Professor Marshall, in your opinion does she possess the moral traits of honesty and integrity required of her to faitfully [sic] discharge her duties in the legal profession in your opinion?

"A. Absolutely, because, unfortunately, I do not have a wealth to have a trust, but if I had a trust fund I would certainly hire her to administer it or do something similar to that. I have no doubt of her integrity and qualifications."

A careful review of the transcript reveals that while Professor Marshall was not aware of the extent of applicant's actions on the afternoon of the multistate exam, he was nevertheless steadfast in his opinion of her redeeming qualities that should merit a second chance after rehabilitation. On cross-examination the professor responded to the following question:

"Q. And I want you to assume that for perhaps two hours or more that Ms. Corrigan observed the paper of her tablemate and made notations on her answer sheet to correspond with some things she saw in his answer sheet and she made an attempt to try to correlate questions from her test booklet with questions in his test booklet to see if she could determine if his 113 would be question 115 in her book to see if there was any pattern or if she could correlate the questions.

"Then I want you to assume that

when the examination was over after the third day, and this Multistate took place on the second day, that when the examination was concluded on the third day she was then confronted with allegations considering the conduct and for approximately 45 minutes she denied any impropriety or wrongdoing and then after about 45 minutes of questioning she then indicated that she had screwed up and was sorry for what she did.

"With those assumptions I guess I am interested in knowing your opinion as to whether or not you believe that person would possess the character and fitness to be admitted to the practice of law in the state of Ohio.

"A. Okay. First of all, if those were the facts that makes it a more serious incident than I initially thought, and that is not because I was misled in any way, I want to make that clear. Colleen and I did talk about the incident very briefly with the idea that at some later point we would talk about it more in depth and because of the situation we never have.

"If that is the situation that is certainly a more serious incident than I had originally thought. Even so, I do not want this to indicate that I condone that kind of activity. I teach law, I am committed to people not cheating in my class, if I find out I have taught my class I would do everything I could to make sure that they didn't get credit for the teaching. With all that in mind I think that what happened here is Colleen cheated on an exam and made a serious mistake. I don't think that mistake, and I don't think that even if it took 45 minutes before she admitted it, that that indicates that she is not qualified to practice law in Ohio. I know too much about her and have great respect for her overall character and integrity.

"I don't think she would ever do something like that again and I will stick with my overall bottom line statement before that I could support her moving for admission at a later point."

Based on the foregoing opinions which are clearly stated in the record, I find the majority's observation that the applicant does not possess any redeeming qualities to be totally baseless.

Notwithstanding the foregoing, the most troubling aspect of the majority's sanction of permanently precluding the applicant from taking the bar exam is that it appears that attorneys who have committed equally serious or more serious moral and ethical offenses have received the lighter sanction of indefinite suspension from this court. With that in mind, I invite the members of the majority to review the following recent cases in which an indefinite suspension was imposed, and ask whether applicant's conduct on one particular afternoon is more egregious than the conduct of the attorneys indefinitely suspended:

*Disciplinary Counsel* v. *Wanner* (1984), 15 Ohio St. 3d 319, 15 OBR 446, 473 N.E. 2d 829 (sexual battery).

*Disciplinary Counsel* v. *Collins* (1985), 17 Ohio St. 3d 41, 17 OBR 34, 476 N.E. 2d 1050 (mail fraud).

*Disciplinary Counsel* v. *Kornowski* (1986), 24 Ohio St. 3d 50, 24 OBR 90, 492 N.E. 2d 833 (conduct involving dishonesty, fraud, deceit or misrepresentation). Therein, this court noted respondent's "cavalier" attitude in failing even to appear at any stage of the disciplinary proceedings.

*Toledo Bar Assn.* v. *Wroblewski* (1987), 32 Ohio St. 3d 162, 512 N.E. 2d 978 (conduct involving moral turpitude, dishonesty, and fraud or misrepresentation).

*Disciplinary Counsel* v. *Bica* (1988), 35 Ohio St. 3d 264, 520 N.E. 2d 221 (commingling of estate funds with personal bank account; dishonesty).

*Dayton Bar Assn.* v. *Todd* (1988), 36 Ohio St. 3d 206, 522 N.E. 2d 570 (commingling funds; passing bad checks).

*Disciplinary Counsel* v. *Soucek* (1988), 37 Ohio St. 3d 42, 523 N.E. 2d 513 (possession of cocaine with intent to distribute).

*Disciplinary Counsel* v. *Jones* (1988), 38 Ohio St. 3d 338, 528 N.E. 2d 190 (convictions of drug abuse; neglect of clients' matters).

*Columbus Bar Assn.* v. *Gill* (1988), 39 Ohio St. 3d 4, 528 N.E. 2d 945 (forgery; misuse of client's funds).

*Disciplinary Counsel* v. *Curren* (1988), 39 Ohio St. 3d 117, 529 N.E. 2d 930 (taking excessive attorney fees from guardianship and estate; taking improper guardianship fees and fiduciary fees).

*Disciplinary Counsel* v. *Clark* (1988), 40 Ohio St. 3d 81, 531 N.E. 2d 671 (conviction of felonies relating to drug smuggling and tax evasion before respondent became an attorney).

*Disciplinary Counsel* v. *Leeth* (1989), 42 Ohio St. 3d 97, 537 N.E. 2d 223 (felony conviction of theft by deception from insurance company).

*Disciplinary Counsel* v. *Colburn* (1988), 42 Ohio St. 3d 173, 538 N.E. 2d 110 (conviction of felonious assault and firearm specification).

*Disciplinary Counsel* v. *Randall* (1989), 43 Ohio St. 3d 149, 539 N.E. 2d 160 (convictions of gross sexual imposition and indecent exposure).

*Disciplinary Counsel* v. *Bussinger* (1989), 44 Ohio St. 3d 145, 541 N.E. 2d 609 (failing to preserve the identity of funds and property of a client; conduct involving dishonesty, fraud, deceit or misrepresentation).

*Disciplinary Counsel* v. *Farley* (1989), 45 Ohio St. 3d 363, 544 N.E. 2d 675 (failure to inform client of dismissal of case; failure to return funds deposited with and returned by clerk of courts).

*Disciplinary Counsel* v. *Ryan* (1989), 45 Ohio St. 3d 374, 544 N.E. 2d 686 (misappropriation and conversion of funds from an estate).

When the majority's sanction is viewed in light of the dispositions in the foregoing cases, one cannot help but conclude that at worst the applicant's conduct was no more wrongful or dishonest than the conduct of the attorneys indefinitely suspended. At best, her conduct is somewhat less egregious or less depraved than the conduct of those attorneys who were given a chance for rehabilitation. In sum, the punishment in the instant case does not fit the conduct which applicant admits, especially when compared to the conduct and punishment given in other cases.

Based on the briefs and arguments submitted, it is clear that the applicant did not bring this appeal to contest her culpability or minimize her guilt; rather, it is obvious that the applicant is begging this court for a chance — some time in the future — to prove her rehabilitation. Given that the record displays evidence of some redeeming qualities in the applicant's character and personality, I believe that an indefinite suspension is more fitting punishment than the extraordinary sanction this court has given.

Accordingly, I would reject the board's recommendation and indefinitely suspend the applicant from applying for admission to the bar of this state.